## MARTIN *v.* BARBOUR *et al.*[1]

### (*Circuit Court, E. D. Arkansas.*   April, 1888.)

**1. TAXATION—ASSESSMENT—OATH OF ASSESSOR.**

The constitution of the state of Arkansas declares that "all property subject to taxation shall be taxed according to its value; that value to be ascertained in such manner as the general assembly shall direct." The revenue act of the state requires the assessor, before entering on the discharge of the duties of his office, to take the oath of office prescribed by the constitution for all state and county officers, and, in addition thereto, a comprehensive oath covering in detail his official duties, and particularly the declaration that "all real property will be appraised at its actual cash value." This oath is required to be indorsed on the assessment book, which the clerk makes, prior to its delivery to the assessor; and, if the assessor fails to take said oath within the time prescribed, his office is declared vacant, and the clerk is required to notify the governor, and the vacancy is to be filled according to law. *Held*, that the oath which the assessor is required to take is one of the means provided by the legislature to give effect to the constitutional requirement that property shall be taxed according to its value; that the failure to take the oath vacates *ipso facto* his office; and that where the assessor fails to take the oath, and the clerk, in violation of law, delivers to him the assessment book, no assessment on that book can be made the foundation of a valid tax title.

**2. SAME—SALE—PUBLICATION.**

When the delinquent list and notice of sale, and proof of their publication, are required to be perpetuated by a record, to be certified to by the clerk before the sale, it is indispensable that such record be kept; and parol evidence is inadmissible to supply the omission.

**3. SAME.**

Where a statute requires the notice of sale of delinquent lands to be published "weekly for two weeks" between the fourth Monday in April and the fourth Monday in May, two weeks must elapse between the first publication and the fourth Monday in May; and where the publication is made on the 16th and 23d days of May, and the fourth Monday of the month is the 25th, the notice is void.

**4. SAME.**

Where the notice of sale prescribed by law has not been given, the collector has no authority or jurisdiction to sell, and before he sells, his jurisdiction, in this regard, must be made to appear of record, in the mode prescribed by the statute.

**5. SAME.**

Affidavits of the proof of publication of the notice of the tax sale, made and placed in the clerk's office more than two years after the tax sale, are no part of the record of the tax proceedings, or of the official files of the clerk's office, and have no legal sanction.

---

[1] Reported by Messrs. Stephenson & Trieber, of the Helena bar.

6. SAME—RIGHT TO REDEEM—MISCONDUCT OF OFFICER.

When the owner of a lot which has been sold to the state for taxes, without his knowledge, is prevented from discovering the sale and making redemption by the official misconduct or mistake of the officer who makes out the assessment book, he will be permitted to redeem on discovering the facts.

7. SAME—CAVEAT EMPTOR.

The rule of *caveat emptor* applies to the purchaser of a tax title.

8. SAME—TAX TITLES—GROUNDS OF CONTEST.

Mansf. Dig. Ark. §§ 5782, 5791, do not apply to meritorious defenses, and by meritorious defenses is meant any act or omission of the revenue officers in violation of law and prejudicial to the rights and interests of the owner, as well as those jurisdictional and fundamental defects which affect the power to levy the tax, or sell for its non-payment. *Radcliffe* v. *Scruggs*, 46 Ark. 96.

In Equity. Bill to confirm tax title.

*U. M. & G. B. Rose*, for complainant.

*J. M. Harrell*, for defendants.

CALDWELL, J. This is a proceeding under chapter 23, Mansf. Dig., to confirm a tax title to lot 5, in block 145, and other lots and lands not here in controversy, in the town of Hot Springs. The lot was sold to the state on the 25th day of May, 1885, for the taxes of 1884, and at the expiration of two years—the period allowed by law for redemption—it was certified to the commissioner of state lands, and immediately thereafter purchased by the plaintiff from that officer. The bill was filed in the Garland circuit court. The defendants, Frances M. Barbour, a married woman, and her infant children, Howard P. Munger, Grace E. Munger, and Robert P. Munger, by their next friend, Ormand Barbour, entered an appearance to the suit in that court, and removed the cause to this court. It is clear from the proofs that the lot belongs to Mrs. Barbour, or to her and her children, unless the tax sale divested them of title. The defendants allege the tax title is void for numerous reasons.

The act of March 31, 1883, under which the tax title in judgment accrued, provides that the assessor, before entering upon the discharge of the duties of his office, shall take and subscribe the oath of office prescribed by the constitution for all officers, "and, in addition thereto, the following oath or affirmation, which shall be indorsed upon the assessment books prior to their delivery to the assessor." [Here follows the oath, which is comprehensive and exacting, and contains the declaration that "all real * * * property * * * will be appraised at its actual cash value."] Section 5661, Mansf. Dig. Section 5662 declares:

"If any person so elected fails or refuses to take the oath required in the preceding section, and file the same with the clerk of the county court of his county within the time prescribed, the office shall be declared vacant, and the clerk of the county court shall immediately notify the governor, and such vacancy shall be filled in accordance with the constitution and laws of the state."

The defendants have shown that the oath here required is not "indorsed upon the assessment books" for the year 1883, nor has it been found elsewhere. This proof rebuts the presumption that it was taken, and imposes upon the plaintiff the burden of proving that it was. This bur-

den the plaintiff has not discharged, and the conclusion must be, the oath was not taken. "Where a paper is not found, where, if in existence, it ought to be deposited or recorded, the presumption arises that no such document has ever been in existence." *Platt* v. *Stewart*, 10 Mich. 260; *Hall* v. *Kellogg*, 16 Mich. 135. In considering the legal effect of the failure of the assessor to take this oath, a brief reference to the legislation on this subject will be instructive. From 1846 to 1868, sections 8, 9, c. 148, Gould's Dig., were in force. These sections required the assessor, within a prescribed period, and before entering upon the duties of his office, to take the oath there set out, and vacated his office upon his failure to do so. The act of July 23, 1868, repealed these sections, and the only oath required of the assessor by that act was one to support the constitution of the United States and this state, and it rewarded the assessor for his services by giving him "three per centum on the amount of taxes levied on his assessment." Subsequent acts (act April 8, 1869, § 60, and act March 25, 1871, § 59) required the assessor to verify his return by an oath to the effect that he had "not appraised any lot or tract of land at less than its true value in money." This oath was not in harmony with the constitutional requirement that property should be taxed at its value. It afforded no protection to the land-owner, but, on the contrary, its terms conveyed a strong implication that the assessor was licensed, if not invited, to assess land for taxation at more than its value, and loud complaints were made that it was so assessed. In *Radcliffe* v. *Scruggs*, 46 Ark. 96, it was decided that the failure of the assessor to take this oath did not affect the validity of the assessment, because it was "intended to protect the interests of the state, rather than the tax-payer; * * * and no owner of real estate could have been injured by its omission." From 1868 to 1883, the only oath the assessor was required to take before entering on the duties of his office was the general oath of office prescribed by the constitution for all state and county officers. Section 5105, Gantt's Dig. The same section required that he should make oath "to his return," according to a form given. But this latter oath could only be taken after he had completed his assessment. The act of March 31, 1883, is the result of a complete revision of the revenue laws of the state; it was doubtless intended to harmonize the law on the subject with the constitutional requirement, and correct the evil of excessive assessments that had grown up under previous legislation. The constitution requires that "all property subject to taxation shall be taxed according to its value; that value to be ascertained in such manner as the general assembly shall direct. * * *" Article 16, § 5, Const. 1874. To carry out this provision of the constitution, the act of 1883 requires the assessor, before entering upon or discharging any of the duties of his office, to take, in addition to the general oath of office, the searching and exacting oath set out in section 5661, Mansf. Dig. A binding oath laid upon the assessor who is about to go forth to value property, that he will appraise it at its actual cash value, is probably the most usual and appropriate, if not the only, means the legislature can provide to secure the taxation of property according

to its value, as required by the constitution. It is undoubtedly one of the means provided by the legislature for that purpose. The requirement is, therefore, in effect, the same as if it had been imposed by the constitution itself. The oath is more comprehensive and exacting than that required by Gould's Digest. Some of the provisions intended to preclude the assessor from exercising the duties of his office until he has taken the oath are not found in any other statute in this, nor is it believed, in any other, state. The requirement that the oath "shall be indorsed upon the assessment books prior to their delivery to the assessor" appears first in this act.

It is the duty of the county clerk to make up the assessment book or roll of real estate in the county, showing each subdivision and the name of the owner. Section 5694, Mansf. Dig. To this assessment book the assessor simply adds his appraisement of each lot and parcel of land. This is the assessment book referred to in section 5661. This book the clerk is required to make up and deliver to the assessor on or before the first Monday in February. But by section 5661, the clerk is forbidden to deliver, and the assessor to receive, this book, until the required oath is taken; and, that there may be no misunderstanding or doubt as to whether the oath has been taken, the law requires that it shall be indorsed on the book itself. A failure to take this oath within the time prescribed, *ipso facto* vacates the assessor's office. Legislative ingenuity has exhausted itself in an effort to compel the assessor to take this oath or vacate his office. These provisions were enacted in the interests of property owners; and when the assessor refused to take the required oath, and the clerk, in violation of law and his duty, delivered to him the assessment book, no assessment on that book can be made the foundation of a valid tax title. If the law were otherwise, no property owner could ever hope to have his property appraised for taxation by an assessor bound by the obligations of an oath to appraise it at its value. But in this forum this question is foreclosed by the judgment of the supreme court of the United States in *Parker* v. *Overman*, 18 How. 137. That was a proceeding like the one at bar, and the tax title sought to be confirmed was held invalid because the assessor did not take the oath prescribed by section 8, c. 148, Gould's Dig., within the required time. The court say:

"The principal objection to the regularity of the sale in this case, and the only one necessary to be noticed, is that the land was not legally assessed. A legal assessment is the foundation of the authority to sell; and, if this objection be sustained, it is fatal to the deed. In order to qualify the sheriff to fulfill the duties of assessor, the statute requires that on or before the 10th day of January in each year the sheriff of each county shall make and file in the office of the clerk of the county an affidavit in the following form, etc., and if any sheriff shall neglect to file such affidavit within the time prescribed in the preceding section, his office shall be deemed vacant, and it shall be the duty of the clerk of the county court without delay to notify the governor of such vacancy. * * * The record shows that Peyton S. Bethel, the then sheriff of the county of Dallas, did not file his oath as assessor on or before the 10th of January, as required by law. He did file an oath on the 15th of March, but this was not a compliance with the law, and conferred no power on him to act

as assessor. On the contrary, by his neglect to comply with the law his office of sheriff became *ipso facto* vacated, and any assessment made by him in that year was void, and could not be the foundation for a legal sale."

In *Moore* v. *Turner*, 43 Ark. 243, Mr. Justice EAKIN, referring to the case of *Parker* v. *Overman, supra*, said:

"Upon an appeal to the United States supreme court it was held that in such a proceeding, expressly provided to give every one interested an opportunity to contest the legality and regularity of every step in the proceedings, it might be shown that the preliminary affidavit was not filed in time. This is regarding the affidavit, not as an oath of office, but as a preliminary step to the assessment proceedings; a part, as it were, of the legal machinery by which the revenue was to be collected, or the citizen deprived of his property; and this is certainly the correct view of the case, as our law then stood."

The law as it "then stood," and the law applicable to the case at bar, are the same, save that the present law, for the better protection of the property owner, amplifies the assessor's oath, and adds new and stringent provisions intended to make it impossible for the assessor even to obtain the assessment books, until he has taken the required oath. The word "deemed" in the old law, and "declared" in the present act, have the same meaning in the connection in which they are used. The failure to take the oath vacates *ipso facto* the office. The clerk is the maker and custodian of the assessment book, until the assessor's oath is recorded upon it, and also filed in his office; and when it is not taken within the prescribed time, he is required to "immediately notify the governor, and such vacancy shall be filled." No proceeding to vacate the office is provided for or contemplated. The exigency of the business will not admit of any such proceeding. It would be inconsistent with the dispatch indispensable to the making of a valid assessment. *Falconer* v. *Shores*, 37 Ark. 386; *Alston* v. *Falconer*, 42 Ark. 114; *Elsey* v. *Falconer*, Id. 117. The doctrine of the supreme court of the United States on this question finds support in the following cases: *Pike* v. *Hanson*, 9 N. H. 491; *Langdon* v. *Poor*, 20 Vt. 13; *Payson* v. *Hall*, 30 Me. 319; *Morris* v. *Tinker*, 60 Ga. 466; *Railway Co.* v. *Donnellan*, 2 Wy. 479; *Coit* v. *Wells*, 2 Vt. 318; *Isaacs* v. *Wiley*, 12 Vt. 674; *Ayers* v. *Moulton*, 51 Vt. 115; *Dresden* v. *Goud*, 75 Me. 298.

The list of delinquent lands and notice of sale were required "to be published weekly for two weeks," between the fourth Monday in April and the fourth Monday in May, 1885. Act March 5, 1885, § 3, and section 5762, Mansf. Dig. Section 5763, Mansf. Dig., provides that "the clerk of the county court shall record said list and notice in a book to be kept by him for that purpose, and shall certify at the foot of said record, stating in what newspaper said list was published, and the date of publication, for what length of time the same was published before the second Monday in April then next ensuing, and such record, so certified, shall be evidence of the facts in said list and certificates contained." The clause of the section "then next ensuing" shows that this record is required to be made before the day of sale, but it was not so made, and has never been made. When the notice and proof of publication are required to be perpetuated

by a record, it is indispensable that it be so done; and parol evidence is inadmissible to supply the omission. *Kellogg* v. *McLaughlin*, 8 Ohio, 114; *Minor* v. *McLean*, 4 McLean, 138; *Langdon* v. *Poor*, 20 Vt. 13; *Iverslie* v. *Spaulding*, 32 Wis. 394; *Taylor* v. *French*, 19 Vt. 49; *Tolman* v. *Hobbs*, 68 Me. 316; Burroughs, Tax'n; 293 Black, Tax Titles, p. 229. Presumptions cannot supply the place of a record when the law requires one, nor can they help out a defective record. Id.; and Cooley, Tax'n, (2d Ed.) 480. The plaintiff seeks in various ways to supply the record of the notice of sale and proof of its publication, which the law requires to be made, and which was not made. Attached to copies of the delinquent list and notice of sale are certified copies of what the clerk terms in his certificate, "the advertisement and proof of publication." An inspection of this proof of publication discloses the fact that the affidavit of the publisher of the paper in which the same was published, was sworn to on the 9th day of November, 1887, two years and a half after the sale, and several months after the suit was brought. The certified copy has no file-mark upon it, but it was probably not filed before it was sworn to. If such proof was competent, it would not aid the plaintiff, because the proof of publication shows that the notice was published on the 16th and 23d days of May, 1885. The law required it "to be published weekly for two weeks," between the fourth Monday in April and the fourth Monday in May, 1885. The fourth Monday in May, 1885, was the 25th day of the month. The publication of the notice on the 16th and 25th days of May was not a compliance with the law. It is essential to the validity of a notice under this act that two weeks shall elapse between the first publication and the fourth Monday in May. *Pennell* v. *Monroe*, 30 Ark. 661. In *Thweatt* v. *Black*, Id. 739, Chief Justice ENGLISH, delivering the opinion of the court, said:

"The object of the advertisement is twofold: *first*, to notify the owners of land or persons having an interest in it, or charged with the duty of paying the taxes upon it, that the taxes are unpaid, and that the land will be sold for the taxes unless paid before the sale; and, *second*, to bring together competing bidders at the sale, etc. The advertisement is a prerequisite to the authority of the officers to sell, and must be made in accordance with the requirements of the law. * * *."

In *Bagley* v. *Castile*, 42 Ark. 77, it was held that an act which authorized the sale of delinquent lands without notice was unconstitutional. Judge Cooley, referring to the notice of sale of delinquent lands says:

"Whatever the provision is, it must be complied with strictly. This is one of the most important of all the safeguards which has been deemed necessary to protect the interests of parties taxed, and nothing can be a substitute for it, or excuse the failure to give it." Cooley, Tax'n, (2d Ed.) 483, and cases cited.

Where the notice is for less than the statutory time, it is as fatal as if no notice had been given. Id. 484; Black, Tax Titles, p. 83. Discovering this fatal error in his first effort to supply the unkept record, the plaintiff offers in evidence a certified copy of the affidavit of the publisher of the paper that the notice was published on the 9th, 16th, and 23d days of May, 1885. This affidavit was sworn to on the 17th day

of February, 1888, and filed in the county clerk's office on the 23d day of that month, and the copy offered here certified on the same day. There is no copy of the delinquent list and notice published annexed to the certified copy of this affidavit, as required by law, (section 4359, Mansf. Dig.;) but the clerk certifies "that attached to the foregoing proof of publication is the same printed advertisement of tax sale copied in the transcript in reference to the assessment, collection, and sale for taxes of the year 1884, furnished U. M. and G. B. Rose, under my certificate and seal, on the 15th day of February, 1888." Of course this certificate is extra-official and proves nothing, and if the list and notice were attached it would prove nothing. Necessity sometimes justifies the use of *ex parte* affidavits in judicial proceedings, but they are an exceptional species of proof not favored by the courts. When competent at all, it is in the court where the suit is pending, and where the opposing party can be heard to object or to file counter-affidavits. But to allow the title to an estate to be changed by an *ex parte* affidavit, filed in the clerk's office of another court long after the transaction to which it relates has been closed, and suit brought, and without notice to the opposing party, would be intolerable. If that were the law, affidavit-making would rapidly rise to the dignity of a fine art, and a lucrative one. In a country of law, titles do not hang on such a slender thread. If a tax title is bad in law it falls, because it is so purely a technical, as distinguished from a meritorious, title, that a court of equity will not lend its aid to correct the errors of officers that invalidate it. *Altes* v. *Hinckler*, 36 Ill. 265; *Keepfer* v. *Force*, 86 Ind. 81; *Bowers* v. *Andrews*, 52 Miss. 596. It would be a singular perversion of the law on this subject if that which a court of equity cannot do with all the parties before it, could be done by filing out of time an *ex parte* affidavit in the clerk's office. Making and placing these affidavits in the clerk's office more than two years after the tax sale did not make them a part of the record of the tax proceeding, or of the official files of that office. They were placed there without authority of law, and have no legal sanction.

The plaintiff next seeks to prove by the deposition of the publisher of the paper that the notice was published on the 9th, 16th, and 23d days of May, but no copy of the delinquent list or notice is made an exhibit to his deposition, and he only says: "To the best of my recollection each publication was the same as that filed with the clerk in proof of publication." If they are the same, it could easily have been shown, and ought to have been. The deputy-clerk, who had the custody of the tax-books, and special charge of matters relating thereto, at the time, testifies that they "made it a point to keep the papers," and that the notice "was published twice,—once on the 16th day of May, 1885, and the last on the 23d day of May, 1885." If the notice was published on the 9th of May it is highly probable that that publication was for some reason fatally defective. It is certain that it was disregarded by all parties at the time, and the publication on the 16th and 23d alone counted upon. Why should the printer publish it on the 23d if it had been properly published twice before? If parol evidence and *ex parte* affidavits were competent

evidence it would boot the plaintiff nothing, because the clear weight of the evidence is that the list and notice exhibited were published on the 16th and 23d of May, and on no other day; but all such evidence is incompetent. The law plainly prescribes how proof of such publication shall be made, (section 4359, Mansf. Dig.,) and, in the case of notice of tax sales, requires a record of them to be made, and certified to by the clerk before the sale, (section 5763, Mansf. Dig.) Until the notice prescribed by law has been given, the collector has no authority or jurisdiction to sell; and before he sells, his jurisdiction to do so must be made to appear of record in the mode prescribed by law. The supreme court of Wisconsin, in discussing this question, said:

"The counsel for the plaintiff conceded that if the defect related to any matter which the statute required should be recorded, then parol evidence would be inadmissible to supply the omission. But we think the same rule should be applied to the affidavits, under the circumstances, that would apply to a statement which the law requires should be recorded; for these affidavits constituted in fact a part of the record of the tax proceedings, and may have been examined by the original owner, who failed to redeem solely for the reason that he discovered there was no record evidence that any proper notice of sale had been given by the county treasurer." *Iverslie* v. *Spaulding,* 32 Wis. 394.

The rule is the same in this case that it is in cases where it is sought to conclude a party by constructive service by publication. The rule is stated by this court in *Cissell* v. *Pulaski Co.,* 3 McCreary, 449, in these terms:

"It is a rule without qualification or exception, that when it is sought to conclude a party by constructive service by publication, a strict compliance with the requirements of the statute is required. Nothing can be taken by intendment, and every fact necessary to the exercise of jurisdiction based on this mode of service must affirmatively appear in the mode prescribed by the statute. *Gray* v. *Larrimore,* 4 Sawy. 638–646; *Steinbach* v. *Leese,* 27 Cal. 295; *Staples* v. *Fairchild,* 3 N. Y. 43; *Payne* v. *Young,* 8 N. Y. 158; *Hill* v. *Hoover,* 5 Wis. 371; *Galpin* v. *Page,* 3 Sawy. 93, 18 Wall. 350; *Settlemier* v. *Sullivan,* 97 U. S. 444. It is not competent for this court to receive parol testimony to supply the omission. *Gray* v. *Larrimore, supra; Noyes* v. *Butler,* 6 Barb. 617; *Lowry* v. *Cady,* 4 Vt. 506."

The case of *Com'rs* v. *Morrison,* 22 Minn. 178, is in conflict with the current authorities on this question. The doctrine of that case cannot possibly be the rule under a statute like that in this state.

The revenue law provides that, if no person bids the amount of the tax for the delinquent land at the tax sale, the collector shall bid the same off in the name of the state. Section 576, Mansf. Dig. The clerk is required to attend the sale, and record in a "book to be kept for that purpose each tract of land, town or city lot, sold to the state, together with the taxes, penalty, and cost due thereon." Section 5769, Mansf. Dig. The clerk is required to "immediately after the sale transfer upon the tax-books all lands sold for taxes to the name of the purchaser," (section 5771, Mansf. Dig.,) and "all lands and town lots sold for the payment of taxes shall be thereafter assessed in the name of the purchaser," except that when the state is the purchaser they are no longer assessed or subject to taxation, but are taken off the tax-books, and entered in

the book of state lands, which the clerk is required to keep.  Section 5769, Mansf. Dig.  If the town and city lots purchased by the state are not redeemed within two years from the date of sale, the commissioner is authorized to sell them at private sale for the exact sum for which they were bid in by the state.  Section 4275, Mansf. Dig.  The lot in controversy was bid in by the state for $110.95; and two years afterwards the state sold it to the plaintiff for that sum.  But if the former owner desires to redeem within two years after the sale, he is required to pay what the state bid, "and the taxes which would have accrued thereon if such land or lot had been continued on the tax-book and the taxes extended."  Section 5779, Mansf. Dig.

As the constitution provides that property shall be taxed by a uniform rule, both as to rate and mode of assessment, and as an assessment is essential to the imposition of a tax, there would seem to be some embarrassment in giving effect to this requirement.  How is it to be known what the property would have been assessed at, and what the taxes would have been?  But for the purposes of this case it will be assumed that the provision is valid.  If the lot is sold by the commissioner of state lands after the expiration of the redemption, the state gets no taxes for the intervening years between the purchase at the tax sale and the sale by the state, because during that period it is treated as the property of the state, and the officers are forbidden to put it on the assessment book.  In some states the purchaser at a tax sale cannot obtain a deed under his purchase until he has given the former owner notice of his purpose to apply for one.  Black, Tax Titles, p. 180.  The object of such a law is to give to the former owner, who may be ignorant of the fact that his land has been sold for taxes, an opportunity to redeem it.  The law in this state works out the same result by a different method.  "Immediately" after the tax sale, the land is required to be transferred on the tax-books to the name of the purchaser, if an individual, and when bid in by the state it is taken off the tax-books altogether, and entered on the books of non-assessable state lands.  When one whose lot has been sold to the state for taxes without his knowledge, goes to pay his taxes the next year, if the clerk has done his duty, the owner is confronted with the fact that he has no lot to pay taxes on; that it has been sold to the state for the taxes of the previous year.  Under the law he has the opportunity two years in succession to be thus advised, for two years' taxes accrue and are due before the expiration of the right of redemption.  The fact that land is delinquent by no means proves that the owner has knowingly been guilty of any neglect or dereliction of his duty to the state.  The delinquency may have resulted from fraud, accident, or mistake for which the owner is not to blame.  The facts in the case at bar illustrate this truth.  The property in controversy is a boarding-house or hotel, valued at $7,000 or $8,000.  The owner resided in a distant state, and had a local agent to collect the rents and pay the taxes.  That agent was provided with funds to pay the taxes of 1884, as had been done in previous years.  The owner supposed the taxes were paid; but it now turns out that the agent appropriated the money to his own use, and left the state,

without paying the taxes of that year. The owner employed another agent, who was provided with the necessary funds, and directed to pay all taxes on the lot. The agent applied at the collector's office in apt time to pay all taxes due in 1885, and paid the sum of $105.50, which was all the collector demanded, or that his books showed to be due. The same thing was repeated in reference to the tax of 1886, amounting to $96, which was paid by the agent, and was all that appeared to be due. Neither the owner nor her agent knew of the forfeiture for the taxes of 1884, until the expiration of the period allowed by law for redemption, and the plaintiff had procured his deed. The agent of the owner had the means, and would have redeemed the lot, if he had been advised of the sale. That he was not advised of it was owing to a dereliction of official duty on the part of the county clerk. If that official had done his duty, and transferred the lot to the state, and taken it off the tax-book, the agent, when he went to pay the taxes for 1885, would at once have discovered the forfeiture, and redeemed the lot. The clerk was guilty of the same dereliction of official duty in 1886, for he put it on the tax-books for that year, and the agent again paid the taxes in ignorance of the forfeiture. Upon this state of facts it cannot be maintained that it was the owner's own fault or negligence that she paid two years' taxes on property not subject to taxation, and for which she was in no manner liable, and that for the taxes of these years she has only a remedy against the state for taxes erroneously paid. Under that view of the case, the plaintiff gets the lot for $110.95, free from the taxes of 1885 and 1886; the state has to pay back the taxes for those years, amounting to $201.50, which is just $90.95 more than she got for the lot when she sold it to the plaintiff; and the defendant loses her property; and, if she does not get back the $201.50 paid the state, she loses that sum also; and these startling results are due solely to neglect of an official duty by a public officer. Mistakes or misconduct of officers connected with the assessment and collection of the public revenue are never permitted to work such inequitable and unjust results. The mistake and error of the clerk prevented redemption within the time prescribed by the statute, and the law gives the owner a reasonable time after discovering the mistake to make the redemption; the clerk is not the owner's agent, but the agent of the state, (*Kellogg* v. *McLaughlin*, 8 Ohio, 114,) and the state, no more than an individual, can take advantage of the mistakes of one of her public officers to possess herself of the citizen's land. The principle here involved is clearly stated by the supreme court of Pennsylvania in *Baird* v. *Cahoon*, 5 Watts & S. 540:

"We are of opinion that the court below erred in charging the jury that it was immaterial whether the non-payment of the taxes was owing to the neglect of the agent, or of the treasurer, or both, as we think the determination of the case must depend upon that question. The officer has duties to perform, as well as the owner, when the latter comes to him to pay up the taxes on his unseated lands. Various acts or omissions of the officer may occur, constituting such neglect on his part that the owner ought not to suffer by it, which cannot be defined beforehand, but must depend upon the particular circumstances of each case."

And in *Bubb* v. *Tompkins*, 47 Pa. St. 359, the court said.

"The owner came in proper time to the proper officer, the county treasurer, and offered to pay all charges that were against the land, and it was by mistake of the officer that he did not pay all. * * * His redemption is not invalidated by the mistake of the public officer. It was very natural to trust him,—most people do,—and the law cannot declare such trust wrong."

The county clerk makes and keeps the record of the sale of delinquent lands for taxes; he makes and keeps the record showing the lands bid in by the state for taxes; and he makes up the assessment book of real estate, and is enjoined by law not to put such lands on it, and certainly, if he does, their previous forfeiture ought to be noted. When he put the lot in controversy on the tax-books for 1885, and again for 1886, without noting the previous forfeiture, it amounted to a solemn declaration of record, repeated in each of those years that it had not been forfeited for taxes, and that no delinquent taxes were due upon it. The owner and her agent had a right to presume that the clerk had done his duty. On these facts the owner is entitled to redeem on paying the amount bid by the state, with interest from that date. Cooley, Tax'n, 532–540; Black, Tax Titles, p. 52; *U. S.* v. *Lee*, 106 U. S. 196, 1 Sup. Ct. Rep. 240; *Price* v. *Mott*, 52 Pa. St. 315; *Corning Town Co.* v. *Davis*, 44 Iowa, 628; *Laird* v. *Hiester*, 24 Pa. St. 452; *Dietrick* v. *Mason*, 57 Pa. St. 40; *Van Benthuysen* v. *Sawyer*, 36 N. Y. 150. *Gage* v. *Scales*, 100 Ill. 218. If this was a case where one of two innocent parties must suffer by the wrongful act of a third, the state would have to bear the loss resulting from the misconduct of her own agent. *Conway Co.* v. *Railway Co.*, 39 Ark. 50; *Jiska* v. *Ringgold Co.*, 57 Iowa, 630, 11 N. W. Rep. 618. But this is not that kind of a case. Here the owner and the state both lose by the official misconduct of the officer if it is overlooked, and the sale held valid,—the owner loses the lot, and the state two years' taxes on it. On the other hand, if the sale is void by reason of the clerk's error, the state gets all her taxes, the owner keeps her lot, and the purchaser loses nothing, because he gets back his purchase money with interest. The right to redeem may be rested on another ground. It is obvious that the state has no right to the two years' taxes, if she denies the former owner's right to redeem, and stands on her purchase at the tax sale. The money paid for the taxes of the two years was paid to the same officer, and was distributed in the same way it would have been if it had been paid on a technical redemption of the property; and, the full amount required to make redemption not having been paid by reason of the mistake or misconduct of the clerk, equity will treat it as so much paid towards redemption, and will permit the owner to perfect the redemption, on discovering the mistake. Id. The rule of *caveat emptor* applies to the purchaser of a tax title. He is not a *bona fide* purchaser for value without notice. For such titles the commissioner is directed to "execute to the purchaser a quitclaim deed." Section 4245, Mansf. Dig. The purchaser takes the land in the same plight the state held it, and subject to the same equities and defenses. Cooley, Tax'n, (2d Ed.) 475–553; 2 Desty, Tax'n, 850.

The learned counsel for the plaintiff has pressed upon the attention of the court the case of *Moore* v. *Turner*, 43 Ark. 243. That case arose on a petition of a single tax-payer for a writ of *certiorari* to quash the tax levy for the county, after most of the tax-payers had paid their taxes. The learned judge who delivered the opinion of the court referred at some length to questions relating to the validity of assessments, but these remarks must be held to apply to the case then before the court. The learned judge himself does this on page 252, by calling attention to the difference in the rules of decision between the case then before the court and a contest "between A. and B. for the ownership of a particular piece of property alleged to have been improperly sold for taxes." And by reference to page 262 of the opinion it will be seen the judgment of the court is rested on, and the case only authority for, the doctrine that the writ of *certiorari* is not a writ of right, but one to be granted or refused in the discretion of the court; and that in the exercise of this discretion a circuit court may rightfully refuse to issue the writ on the petition of a single tax-payer to quash the tax levy for a county, no matter how irregular the assessment and levy may be. In the case at bar the holder of the tax title has chosen to proceed in equity for a confirmation of his title, under a statute which provides that if "it shall appear that the sale was made contrary to law, it shall be the duty of the judge to annul it." Section 579, Mansf. Dig. The plaintiff cites and relies on the provision of section 5782, Mansf. Dig., that one claiming title adverse to a tax "deed shall be required to prove that there had been an entire omission to list or assess the property, or levy the taxes, or to give notice of the sale, * * *." It is argued that under this section, a single hour's notice of sale is sufficient; and it would seem to follow logically that it might be given by oral proclamation on the street, or posting a notice on a tree in the forest. The affidavit and record of the proof of publication of notice of sale not having been made and kept in the time and manner required by law, and no other evidence being competent to prove the publication, it is an indisputable presumption of law that no notice was given. Besides, the intensifying adjective "entire" adds nothing to the legal effect of the section. A failure to give the two weeks' notice by five days is, in contemplation of law, an "entire" failure to give the notice required by law. This section worked no change in the law. The limits of legislative power in this direction are stated by the supreme court of this state in *Railroad Co.* v. *Parks*, 32 Ark. 131, and with great precision and perspicuity in *Radcliffe* v. *Scruggs*, 46 Ark. 96. The provision under discussion is not as broad in its scope and design as the statute of limitations of two years, (section 5791, Mansf. Dig.,) construed by the court in *Radcliffe* v. *Scruggs*, and in construing which the court, speaking by Mr. Justice SMITH, said:

"Neither the validity nor the construction of this statute has been settled by previous decisions of this court, further than it does not operate to deprive the former owner of any meritorious defense. And by 'meritorious defense' we mean any act or omission of the revenue officers in violation of law, and prejudicial to his rights or interests, as well as those jurisdictional and funda-

mental defects which affect the power to levy the tax, or sell for its non-payment. But while the act cannot have the free course that its framers intended, it is still our duty to give it such effect as may be consistent with legal and constitutional principles. And this may be best accomplished by restricting its operation to mere irregularities or informalities on the part of officers having some duty to perform in relation to the assessment and levy of taxes or sale. Our legislation and previous decisions have always distinguished between this class of defects, which have no tendency to injuriously affect the taxpayer, and substantial defects, such as go to the jurisdiction of the levying court to levy a particular tax, or of the power of the officer to sell for non-payment, or the omission of any legal duty, which is calculated to prejudice the land-owner."

It is obvious that the defenses pointed out to the tax title in suit in this case are "meritorious," as that term is defined by the court in *Radcliffe* v. *Scruggs*, and by the weight of authority, and that the legislature cannot deprive the property owner of such defenses without, in the language of Mr. Justice SMITH, "transcending the boundaries of its power." *Davis* v. *Minge*, 56 Ala. 121; *Stoudenmire* v. *Brown*, 57 Ala. 481; Cooley, Tax'n, (2d Ed.) 298, 299, 521, and cases cited, and notes; Black, Tax Titles, 253; *Silsbee* v. *Stockle*, 44 Mich. 561, 7 N. W. Rep. 160, 367.

The question whether Mrs. Barbour, as a married woman, has not a right to redeem without regard to the validity of the sale, and whether her infant children have not an interest in the lot which would entitle them to redeem under the statute, and objections to the validity of the tax sale, other than those passed upon, are not decided.

Let a decree be entered declaring the plaintiff's deed void, giving him a lien on the lot for the purchase money and interest, and directing the sale of the lot unless the amount is paid into the registry of the court for his use within 20 days, and that the plaintiff pay all costs.